JUDGMENT

PER CURIAM.
These cases were considered on petition for review and cross-application for enforcement of an order of the National Labor Relations Board (“the Board”) and was briefed and argued by counsel. It is
ORDERED AND ADJUDGED that the petition for review is denied and the Board’s cross-application for enforcement is granted.
Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. See Fed. R.App. P. 41(b); D.C.Cir. Rule 41.

MEMORANDUM

Beginning in early 2007, District Council of Ironworkers union member Brady Bratcher began an effort to organize employees of Post Tension of Nevada, Inc. (“the employer”). The Board found that the employer had violated Sections 8(a)(1) and (3) of the National Labor Relations Act (“the Act”), 29 U.S.C. § 158(a)(1) & (3). The employer contends the Board’s findings are unsupported by substantial evidence. In accord with our “highly deferential” standard of review, Capital Cleaning Contractors, Inc., v. NLRB, 147 F.3d 999, 1004 (D.C.Cir.1998); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we deny the petition.
1. Establishment and Maintenance of an Overly Broad and Discriminatory Rule Prohibiting Employees From Going to the Chevron Station and Informing Employees of a Change in Paycheck Distribution. The Board found that at the August 24 meeting, Superintendent Pick-ens directed that foremen not take employees to the Chevron gas station when they fueled their vehicles before going to a job site, because Bratcher was there. Pickens also told the foremen the employer would stop distributing paychecks on Friday mornings in order to discourage the employees from going to the station to cash their checks. The foremen relayed *6 these directives to their crews. The Board concluded the rule embodied in these statements violated Section 8(a)(1), whether or not the changes were effectively enforced. The employer contends the evidence did not support finding a violation because (1) telling foremen not to meet with union representatives is not in itself a violation of the Act, and (2) the foremen were not the employer’s agents when making those statements and therefore Pick-ens’s statement was inadmissible hearsay that the Board should not have considered. Neither contention has merit.
First, an employer violates Section 8(a)(1) by promulgating discriminatory work rules that “would reasonably tend to chill employees” in exercising their Section 7 rights. Guardsmark, LLC v. NLRB, 475 F.3d 369, 374 (D.C.Cir.2007) (internal citation omitted). The undisputed evidence was that employees always rode to the job sites in the foremen’s vehicles. The Board thus could reasonably find that Pickens was imposing his directive on the employees when he directed the foremen not to take employees to the Chevron station and that Pickens’s actions thereby would tend to chill Section 7 rights. Furthermore, the Board could reasonably conclude that the rule was discriminatory because it was announced after the employer realized the employees’ stops at the Chevron station were facilitating talks with a union representative. To the extent the employer suggests the Board failed to consider the employer’s asserted legal obligation to tell its supervisors not to take employees to the Chevron station so as to avoid violating Section 8(a)(2), 29 U.S.C. § 158(a)(2), the Board found that for years the employer had permitted employees to stop at the Chevron station and had less drastic options for controlling foremen’s activities than announcing an “oversweep-ing” ban on this longstanding practice. That the rule was rarely enforced and employees continued to receive them paychecks on Friday mornings does not undercut the evidence of violation, for the “mere maintenance” of a rule that tends to chill Section 7 activity constitutes an unfair labor practice “even absent evidence of enforcement,” Guardsmark, 475 F.3d at 375.
Second, the Board’s finding the foremen were agents of the employer necessarily stemmed from the undisputed fact that the foremen were statutory supervisors relaying a directive of their employer. The emjoloyer attempts to characterize this finding as “blindly imput[ing] agency to a prounion supervisor when the supervisor is acting against the employer’s interest.” Petitioner’s Br. at 12. However, it is difficult to see error in implicitly concluding that the foremen were not “acting against the employer’s interest” since they were relaying to employees the exact directives of the employer. To the extent the employer suggests that because the foremen were sympathetic to the union the Board should have found all their actions to be outside the scope of their employment, the Board reasonably could expect a supervisor’s pro-union sympathies to make his anti-union statements more likely to give employees “just cause to believe that he was acting for and on behalf of’ the employer. Oil, Chemical, and Atomic Workers Int’l Union v. NLRB, 547 F.2d 575, 585 (D.C.Cir.1976).
2. Threat to Discharge Employees who Participated in a Strike. Based on Pickens’s testimony, the Board found that shortly after his private meeting with the foremen, he went outside to find that most employees had not gone to work. Pickens admitted that when the employees told him they were going to unload their tools, he said “there’s work to be done. If you don’t want to do. it, I’m going to-I’m *7 assuming you quit.” The Board found these circumstances analogous to those in Accurate Tool & Mfg. Inc., 335 N.L.R.B. 1096, 1096 (2001), in which the Board found a threat of discharge based on the employer’s statement, as his employees were walking out, that if they did not return to work within two minutes he would accept their failure to return as a resignation. The employer contends the circumstances are more akin to Pink Supply Corp., 249 N.L.R.B. 674 (1980), in which the Board found no violation where employees engaged in a concerted work stoppage, the employer told the employee’s spokesperson that it needed people to do the employees’ work, and therefore he would have to act as though the employees were quitting and find replacements. However, whatever may be the distinctions between the cases, consistent with the Supreme Court’s recognition of “the Board’s competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship,” NLRB v. Gissel Packing Co., 395 U.S. 575, 620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), this is exactly the type of determination that a court is loath to second-guess, and we defer to the Board’s reasonable decision on this ground.
3. The Finding that the Strike ivas an Unfair Labor Practices Strike. The employer contends the Board could not reasonably find from the evidence that the strike was due to the promulgation of the rule against going to the Chevron station, since evidence showed the rule was promulgated a month earlier and was being ignored. This, however, is a challenge to the Board’s adoption of the administrative law judge’s credibility determinations, to which courts grant deference unless they are “hopelessly incredible,” “self-contradictory,” or “patently unreasonable.” Capital Cleaning Contractors, 147 F.3d at 1004. Employees testified that they did not like being restricted from going to the Chevron station and speaking with union representatives, had complained to their foremen, and discussed striking because of the rule limiting their access to Bratcher. When strikers are motivated by both economic concerns and labor law violations, the strike is an unfair labor practice strike if the employer’s unlawful acts had “anything to do with causing the strike.” General Drivers and Helpers Union, Local 662 v. NLRB, 302 F.2d 908, 911 (D.C.Cir.1962). In light of the testimony, the Board reasonably credited testimony demonstrating that the rule contributed to the strike. See Capital Cleaning Contractors, 147 F.3d at 1004.
4. Refusal to Give an Employment Application to a Union Organizer. The Board found the employer violated Section 8(a)(1) on September 7, 2007 when, because of Bratcher’s union affiliation, the employer refused to give him an application for employment and threatened to call the police to arrest him if he did not leave the employer’s office. The employer disputes this violation because, it contends, Bratcher did not actually seek employment. However, the Board did not find a violation based on a refusal to consider Bratcher for employment or to hire him. Rather, citing Tradesmen Int’l, Inc., 351 NLRB 399, 351 N.L.R.B. No. 27 n. 4 (2007), the Board reasonably concluded that the employer’s hostile rebuff to Bratcher’s request for an application was coercive, in violation of Section 8(a)(1). The employer’s view that the Board erred in considering FES, 331 N.L.R.B. 9 (2000), supp. 333 N.L.R.B. 66 (2001), enfd 301 F.3d 83 (3d Cir.2002), because FES was “gutted,” by Toering Elec. Co., 351 NLRB 225, 351 N.L.R.B. No. 18 (2007), goes nowhere. The Board did not address FES in the context of the Section 8(a)(1) violation; *8 instead, it dismissed the Section 8(a)(3) allegation under the less employer-friendly FES standard.